**Todd M. JOHNSON, Sr., Plaintiff–Appellant,**

v.

**Joseph GANIM, Ron Rapice, and City of Bridgeport, Defendants–Appellees.**

**Docket No. 02–9180.**

United States Court of Appeals, Second Circuit.

Argued: June 26, 2003.

Decided: Aug. 27, 2003.

John R. Williams, New Haven, Connecticut, for Plaintiff–Appellant.

John R. Mitola, Associate City Attorney, Office of the City Attorney, Bridgeport, Connecticut, for Defendants–Appellees.

Before: STRAUB and POOLER, Circuit Judges, HURD, District Judge.[1]

HURD, District Judge.

Plaintiff-appellant Todd M. Johnson, Sr. ("Johnson"), pursuant to 42 U.S.C. § 1983, alleges that defendants-appellees Joseph Ganim ("Ganim"), Ron Rapice ("Rapice"), and the City of Bridgeport ("City") suspended and terminated him in retaliation for a letter he wrote criticizing the Ganim administration, in violation of his First Amendment right to free speech. The United States District Court for the District of Connecticut (Dominic J. Squatrito, *Judge* ) approved and adopted in whole Magistrate Judge Thomas P. Smith's recommendation to grant summary judgment in favor of defendants. Although we find that Johnson waived his right to appeal the grant of summary judgment to the City, and agree that Johnson failed to produce enough evidence of Ganim's personal involvement in the alleged deprivation, summary judgment was inappropriate as to Rapice. Accordingly, we affirm in part and vacate and remand in part.

## BACKGROUND

### I. FACTS

Johnson was employed as a City custodian from April 12, 1993, to June 3, 1999. During Johnson's tenure, Ganim was the City Mayor and Rapice was a City Labor Relations Officer. Johnson was heavily involved and interested in his local union, of which he was a member for a number of years. He participated in demonstrations protesting the status of union workers' rights and the policies and practices of the Ganim administration. Johnson claims that on more than one occasion a member of the administration and members from the Labor Relations Office would approach him and ask for documents he was handing out during protests. Both Ganim and Rapice admit to having observed Johnson in protests some time between January

---

1. David N. Hurd, United States District Judge for the Northern District of New York, sitting by designation.

and June of 1999, but both claim to have been unaware of the subject matter of such protests.

For a time, Johnson was a union officer. While in that capacity, he sought to uncover what he perceived to be collusion between the union executive board and Ganim. He also expressed a desire to run against and replace the union president in an election. He also claims Rapice permanently ejected him from the City Labor Relations Office. Eventually, Johnson was stripped of his officer position.

Over the years he was employed by the City, Johnson wrote several letters to the administration, including specifically to Ganim, complaining about the administration's policies and practices. One such printed letter, dated January 7, 1999, and marked "Official Documentation," which triggered into motion the events leading up to this lawsuit, reads unaltered as follows:

To whom it may concern:

I recommend the Ganim Administration send thier Labor Relations Officers and 75% of thier supervisors (the *appointed, not tested* ones)

to the seminar about:

"Violence in the Work Place"

which will be held Jan 27, 1999 in South Norwalk by Linda Maloney

1–203–840–0294.

While the Ganim Regiment is there, they should ask Ms. Maloney *IF*:

harrassment, fear, intimidation, discrimination, demotion, transfer, favoritism, stealing overtime, and union busting, in general

"CAN cause" violence in the workplace.

Well, isn't that what happened with the WPCA? Protests, assaults, shootings, Im glad Mayor Ganim's privitization effort was such a success. I understand P.S.G. Corporation has operated in the red since the take over? Good job Joe!

Its time for change?
Its time to put the blame where it belongs?

C.C.

U.S. Attorneys Office

Honest
Union
For the Workers

Mayor Ganim
Labor Relations (Ron Rapice)

(J.A. 75.) The letter was sent via certified mail, and was not sent through or during the course of Johnson's employment. Johnson admits he felt that all of the things he complained of in the letter happened to him. Just under two weeks later, he sent a letter to the City's Civil Service Commission and Mayor Ganim, lodging accusations of "nepatism" [sic] and "discrimination" in connection with his ex-wife's application for a City typist/clerk position. (J.A. 76–77.) The letter also alleged that the administration harassed Johnson's mother and his ex-wife's father, and demanded the results of several civil service exams and a list of persons hired, and in what order, as a result thereof. The letters were received by the Mayor's office, but it appears Ganim did not personally read them.

The letters were forwarded to the Labor Relations Office. The Director of Labor Relations tasked Rapice with investigating "to see if the letters violated City rules and policies about appropriate behavior in the workplace." (J.A. 65–66.) Rapice conducted a hearing on January 26, 2003, which was attended by Johnson and a union representative. When asked by Rapice about the meaning of the first letter, Johnson refused to answer and abruptly left the room. That same day, Rapice informed Johnson by letter that he was suspended for thirty days, effective immediately, that he was to undergo a psychiatric evaluation, and that he could not return to work until he was designated "fit-for-duty." (J.A. 90.)

Rapice claims the decision to suspend Johnson and have him undergo psychiatric counseling was based on two determinations. First, Rapice determined that the January 7, 1999, letter violated City workplace rules and regulations by engaging in behavior that was "indecent and inappro-

priate," and by Johnson's use of "foul and abusive language that was addressed to other co-workers and City officials." (J.A. 66.) Second, Rapice determined "that the language in the January 7, 1999 letter not only posed a threat to other City employees and officials but also to Mr. Johnson himself." *Id.*

The psychiatric evaluation was arranged by the City's Employee Assistance Program ("EAP"), which was operated by Family Services Woodfield, an outside counseling organization. On March 8, 1999, Johnson met with an EAP representative, who then referred him to Dr. Charles Opsahl, a clinical psychologist, for an evaluation to determine whether he was fit to return to work.

Three days later, Dr. Opsahl evaluated Johnson. In a letter-report dated March 25, 1999, Dr. Opsahl found that Johnson, among other things, avoids disclosing things of a personal nature, is deeply insecure "and has an exaggerated need for affection and attention," is "quite distrustful of others," "sees the world as a threatening and rejecting place and his response is to strike out in anger as a defense against being hurt," shifts the blame for his problems to other people and "accepts little responsibility for his own behavior," "is non-conforming and resentful of authority," and is prone to "erratic and unpredictable" behavior and impulses. (J.A. 101.) Dr. Opsahl also found that Johnson "shows angry resentment toward those he views as being critical and disapproving," and "may vacillate among social withdrawal, sullen passivity, and explosive anger." *Id.* Dr. Opsahl further found that Johnson "experiences a constant and confusing undercurrent of tension and anger," and suffers from "paranoid and suspicious thinking" and possibly "thought disorder." *Id.* Concluding, Dr. Opsahl noted that "Mr. Johnson's history, as well as his current level of impulsivity, certainly raise the question of his propensity to lose control and attempt to harm either himself or someone else." *Id.* Dr. Opsahl therefore recommended that Johnson, prior to returning to work, "engage in intensive psychiatric treatment with an eye toward increasing his self-control, decreasing his impulsivity, and helping him to take responsibility for his own behaviors." (J.A. 102.)

Dr. Opsahl recounted in detail Johnson's "history." Though Dr. Opsahl reported that Johnson had numerous incidents of violence and alcohol and drug abuse in his past, he also noted that Johnson had been sober since June of 1987, had been periodically seeing a psychologist for fifteen years, and that, aside from a fairly recent traffic altercation, there had been no incidents of violence since Johnson became sober. Dr. Opsahl noted no incidents of workplace violence in Johnson's past, and reported Johnson's claim that he was not attempting to threaten anyone in the January 7, 1999, letter.

Rapice did not seek out the opinions of Johnson's psychologist. Dr. Opsahl's recommendations to continue treatment were apparently shared by Johnson's EAP counselor and Rapice. In a letter dated April 22, 1999, Rapice informed a union official that Johnson remained on suspension because of his refusal to follow the recommendations. Johnson expressed his desire to have his EAP counselor speak with his psychologist, Dr. George Steinfeld. There is no evidence that the EAP counselor, Rapice, or anyone connected with Johnson's situation heeded this request. By May 11, 1999, however, Rapice was apparently aware of Dr. Steinfeld and his opinion, as he had offered Johnson the opportunity to change EAP counselors and seek a "third" evaluation.

By letter-report dated May 25, 1999,[2] Dr. Steinfeld responded to Dr. Opsahl's report and offered his own evaluation of Johnson's mental health. Like Dr. Opsahl, Dr. Steinfeld noted that, while Johnson in his past had problems with violence and substance abuse, with the latter often prompting the former, Johnson had been sober for twelve years. Dr. Steinfeld, based on his treatment of Johnson, opined that "the anger which emerged when [Johnson] was drinking is no longer present," and that Johnson has shown "great restraint given the treatment he has been subjected to." (J.A. 199.) While admitting to having also been a " 'whistle blower,' " Dr. Steinfeld nonetheless found the accusations against Johnson to be without merit. Of the findings of Dr. Opsahl and the EAP counselor, Dr. Steinfeld stated:

> The implication was that he is potentially violent and needs help. As the developer of the Bridgeport's [sic] first group for men who batter women (Men & Stress Control), which I led for more than 10 years, as a professional who has counseled many couples and men with anger problems for more than 30 years, a psychologist who has worked in prisons with men who act out, and who has intermittently worked with Mr. Johnson for 15 years, I have to disagree with the opinion that he ever posed a danger to anyone. As is often the case, a person who makes waves, and who rebuses [sic] to go along with what he perceives is the dishonesty of any system, is often accused of being mentally disturbed and dangerous. From my perspective, Mr. Johnson is neither.

(J.A. 200.) Dr. Steinfeld, concluding, offered himself for further services or infor-

mation on Johnson. There is no evidence he was taken up on this offer.

On June 3, 1999, Rapice conducted another hearing with regard to Johnson's situation. At the hearing, Johnson, accompanied by a union representative, was again made the offer of obtaining a third independent evaluation, and he again refused. By letter dated the same day, Rapice informed Johnson he was being terminated for failing to follow the recommendations of the EAP counselor and Dr. Opsahl. In the letter, Rapice claims that he reminded Johnson of the recommendations "on several occasions while you were out 'picketing' City Hall." (J.A. 110.) The letter also noted that, rather than obtaining the third evaluation, Johnson chose to make "his customary threats against Mayor Ganim and declin[ed] to engage in any meaningful dialogue with [Rapice] or [the union representative]." *Id.*

## II. PROCEDURAL HISTORY AND MAGISTRATE JUDGE'S RECOMMENDATION

On August 16, 2000, Johnson filed a complaint in the United States District Court for the District of Connecticut, naming as defendants Ganim, Rapice, and the City. The complaint alleged that defendants suspended and terminated Johnson for writing the letter, in violation of Johnson's First Amendment right to freedom of speech. On January 16, 2002, defendants moved for summary judgment. On May 9, 2002, the motion was referred to United States Magistrate Judge Thomas P. Smith ("the Magistrate Judge") for oral argument and a report and recommendation.

On August 1, 2002, the Magistrate Judge issued a report recommending that defendants' motion for summary judgment

---

**2.** Johnson claims Dr. Steinfeld also sent a letter to Rapice regarding Johnson's situation as early as February of 1999. This letter, along with the letter-report dated May 25, 1999, was sent to Rapice either by certified mail or through the union.

be granted. With respect to Ganim, the Magistrate Judge found summary judgment appropriate because, "[e]xcept for [Johnson's] speculation to the contrary, the record contains nothing that fairly suggests Mayor Ganim had anything to do with [Johnson's] suspension or termination." (J.A. 205.) With respect to Rapice, the Magistrate Judge necessarily had to go further, as there is no question Rapice was personally involved in the decisions to suspend and terminate Johnson.

After describing Johnson's January 7, 1999, letter as "obviously a missive from a disgruntled employee" couched in language that falls "somewhere [sic] between scarcastic [sic] and belligerent" (J.A. 207), and outlining the events subsequent to receipt of the letter, the Magistrate Judge first ruled that the letter was a threat. As support, he noted that "[n]othing about [Johnson's] letter suggests that it is a joke." (J.A. 211.) He further opined that "[n]othing suggests that the workplace violence that is alluded to is abstract, contingent, conditional, or remote." *Id.* He also determined that "[n]othing suggests that [Johnson's] remarks are political hyperbole." *Id.* Finding that the reference to "the workplace" was reasonably specific to identify the location of the possible danger and, by implication, the people threatened by the danger, the Magistrate Judge thus determined that the letter was a threat, and that Rapice was therefore entitled to summary judgment.

In the alternative, even if the letter was not a threat, the Magistrate Judge ruled that it was "plainly capable" of such an interpretation, and Rapice's actions were objectively reasonable so as to be entitled to qualified immunity. (J.A. 211–12.) Even if Johnson did have a right to "transmit such a letter [and] then refuse to explain what he meant by it," the Magistrate Judge found that such a right "surely

was not settled" at the time Rapice acted. (J.A. 214.)

Even if the letter was not a threat and Rapice was not entitled to qualified immunity, the Magistrate Judge concluded that summary judgment was still appropriate because the issues addressed in the letter were not matters of public concern. As support for this, he determined that Johnson's "litany of gripes," which were determined to be the "predominant content" of the letter, were a reflection of the fact that the letter addressed only matters of personal interest to Johnson. (J.A. 216–17.) In the alternative, even if the letter addressed matters of public concern, the Magistrate Judge continued, Johnson's interest in writing the letter was still outweighed by "the City's interest in safe, efficient, and effective performance of its municipal government." (J.A. 217.) Therefore, he determined, Rapice was entitled to summary judgment. Further, based on his belief that plaintiff neither alleged nor proved a theory of municipal liability, and because Ganim and Rapice were entitled to summary judgment, he also found that the City was entitled to the same.

On September 11, 2002, the Magistrate Judge's recommendation was adopted and approved by the District Court Judge, and defendants' motion for summary judgment was granted. This appeal followed.

## DISCUSSION

### I. STANDARD OF REVIEW

The district court's order granting summary judgment in favor of defendants is reviewed *de novo*. *Lifson v. INA Life Ins. Co. of N.Y.*, 333 F.3d 349, 352 (2d Cir. 2003). In undertaking such a review, the evidence is construed in the light most favorable to Johnson, the non-moving party, and all inferences are drawn in his

favor. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir.2000). An order granting summary judgment will be affirmed "only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 509 (2d Cir.2002).

## II. FIRST AMENDMENT RETALIATION

The mere fact of government employment does not result in the evisceration of an employee's First Amendment rights. *Hale v. Mann*, 219 F.3d 61, 70 (2d Cir. 2000) (quoting *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); *Lewis v. Cowen*, 165 F.3d 154, 158 (2d Cir.1999) ("It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment.") (citation omitted). "[F]ew values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by the government." *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir.2002).

### A. Plaintiff's Initial Burden

■ Where a public employee is alleging retaliation for the exercise of First Amendment free speech rights, he or she must initially demonstrate that: (1) the speech at issue was "made as a citizen on matters of public concern rather than as an employee on matters of personal interest," *Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir.2002); (2) he or she suffered an adverse employment action, *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir.2001); and (3) "the speech was at least a substantial or motivating factor in the [adverse employment action]," *Sheppard v. Beerman*, 317 F.3d 351, 355 (2d

Cir.2003) (internal quotations and citations omitted). As Johnson in this case suffered a suspension and, ultimately, a termination, and there is no question that he would not have been suspended or terminated but for the letter he wrote, only the first prong need be discussed.

■ Speech by a public employee is on a matter of public concern if it relates "to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684; *Garcia v. State Univ. of N.Y. Health Sci. Ctr.*, 280 F.3d 98, 105 (2d Cir.2001). If the speech, however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, "has greater latitude to discipline" the employee. *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. While this determination may be somewhat fact-intensive, it presents a question of law for the court to resolve. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (citing *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684).

The letter—which accused the administration of "harassment, fear, intimidation, discrimination, demotion, transfer, favoritism, stealing overtime, and union busting" (J.A. 75)—served as Johnson's indictment of the policies and practices of the Ganim administration, which were viewed by plaintiff as tantamount to corruption and crime. "[D]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern." *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir.1998) (internal quotations and citations omitted); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S.

539, 606, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring) ("[C]ommentary on the fact that there is strong evidence implicating a government official in criminal activity goes to the very core of matters of public concern."); *Lewis,* 165 F.3d at 164 (recognizing that "public corruption or wrongdoing," which is present in the "typical *Pickering* case," is almost always a matter of public concern); *Glass v. Dachel,* 2 F.3d 733, 741 (7th Cir.1993) ("[M]atters of public concern do include speech aimed at uncovering wrongdoing or breaches of public trust.").

Not only did the letter concern the alleged unlawful and corruptive practices of the administration, it also outlined in broad terms Johnson's perception of where such practices may lead. The Magistrate Judge in this case found the letter to be a threat, and therefore unprotected by the First Amendment. In a slightly different context, this Court has directed that, "[w]hen determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey gravity of purpose and imminent prospect of execution." *New York v. Operation Rescue Nat'l,* 273 F.3d 184, 196 (2d Cir.2001) (determining whether protesters had violated Freedom of Access to Clinic Entrances Act). While the letter undoubtedly *referenced* violence, it did not *threaten* violence and, despite the Magistrate Judge's finding that everyone in the workplace was by implication threatened by the letter, neither specific persons in danger nor those posing a threat are mentioned. Instead, the reference was made in the context of suggesting that members of the administration attend a seminar exploring the relationship between unlawful or improper activity and violence in the work-

place. This relationship itself is a matter of public concern. Further, there is nothing in the letter suggestive of an unequivocal or unconditional threat. Indeed, Johnson specifically writes that policies like the ones allegedly used by the administration "can" cause violence.

■ Reference to the context and circumstances surrounding Johnson and his relationship with defendants also reveals nothing indicative of a threat, as there is no evidence that he had a propensity towards violence in the workplace, neither in the form of a disciplinary record nor in the multiple prior letters he sent to the administration over the tenure of his employment. That he may have made a poor choice as to the way in which he phrased his communication does not mandate that it be characterized as a threat unprotected by the First Amendment. "The inappropriate or controversial nature of a statement is irrelevant to the question [of] whether it deals with a matter of public concern. '[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Rankin v. McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (quoting *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)); *see also Casey v. City of Cabool,* 12 F.3d 799, 802 (8th Cir.1993) ("Criticism, no matter how obnoxious or offensive, of government officials and their policies clearly addresses matters of public concern."). Therefore, neither the language used nor the relevant context of the letter here compels the conclusion that plaintiff's speech was a threat.

In addition to finding the letter to be a threat, the Magistrate Judge also determined the speech to be unprotected due to

its personal nature. There is no question that Johnson took a personal interest in the matters about which he wrote. He was heavily involved in union activities, and its members, assuming the truth of his allegations, suffer from the administration's improper activities. The thrust of the speech, however, is aimed at the alleged system-wide epidemic that affected not only the union, but the administration itself and the voting public as a whole. Indeed, if the letter is viewed as requesting that action be taken, the benefit of such action would inure more to the group than to him specifically. Therefore, the "predominant content" of the letter addressed matters of public concern.

In any event, the mere fact that Johnson took a personal interest in the subject matter of the speech does not remove the letter from the protection of the First Amendment, *see, e.g., Scheiner v. N.Y. City Health and Hosp.,* 152 F.Supp.2d 487, 495 (S.D.N.Y.2001), nor should it. "[M]ixed motivations are involved in most actions we perform every day; we will not hold [plaintiffs] to herculean standards of purity of thought and speech." *Moore v. City of Kilgore,* 877 F.2d 364, 371–72 (5th Cir.1989). One would hope that any person uttering speech—especially speech of substantial public import—has feeling about the contents thereof. Accepting as true the proposition that a matter is not of public concern if it personally and directly affected the speaker would mean that only those persons with the least amount of firsthand knowledge about the subject matter could utter speech without fear of government reprisal. This position is clearly not sustainable. Thus, Johnson's speech was on matter of public concern and entitled to First Amendment protection.

### B. Pickering Balancing Test

▮ Johnson's satisfaction in making out the initial case outlined above, howev-

er, does not end the inquiry. A government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption. *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.1995). The Magistrate Judge, having found that the letter was not protected by the First Amendment and/or that its classification as a threat rendered unnecessary any analysis of the *Jeffries* factors, did not devote much time to resolving whether these factors were fulfilled. This Court, however, on *de novo* review, finds that factual questions preclude summary judgment.

The second *Jeffries* factor forms the crux of what is commonly referred to as the *Pickering* balancing test. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). While as a general rule the test is a matter of law for the district court to apply, where there are questions of fact relevant to that application, this Court has made known that " '[w]e can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the [district] court's application of the *Pickering* balancing test.' " *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 557 (2d Cir.2001) (quoting *Vasbinder v. Ambach,* 926 F.2d 1333, 1340 (2d Cir.1991)). Noting the parties' disagreement as to whether the plaintiffs' speech had the potential to

disrupt the employer's operations and as to whether the plaintiffs were terminated because of the potential for disruption or because of their speech, the court in *Gorman–Bakos* found the case before it to be "just the kind of case envisioned by the *Vasbinder* [C]ourt." *Id.* Accordingly, it was found improper for the trial court or the court on appeal to resolve the factual disputes, instead instructing the trial court to engage in the balancing test only after the factfinder resolved the factual issues going to the first and third *Jeffries* factors. *Id.* In the instant appeal, as in *Gorman–Bakos*, factual disputes pertaining to the potential for disruption and defendants' motivations in suspending and terminating plaintiff preclude summary judgment.

### 1. Potential for disruption

Because the speech at issue here "substantially involved matters of public concern, the government must make a stronger showing of [potential] interference with operations . . . ." *Bieluch v. Sullivan*, 999 F.2d 666, 671 (2d Cir.1993); *Lewis*, 165 F.3d at 162. Keeping in mind that the letter, as a matter of law, is not a threat, and is therefore entitled to First Amendment protection, reasonable minds could differ as to whether Johnson's speech had the potential to cause disruption.

There is no evidence anyone saw the letter, aside from upper level members of the administration and the United States Attorney's Office. Thus, it is hard to envision defendants viewing the letter as an attempt to entice Johnson's co-workers to engage in workplace violence. Johnson was a custodian for the City. He was not involved in policy-making decisions, and anything he proclaimed, in public or otherwise, cannot be attributed to be on the government's behalf. There is no evidence he had a great deal of contact with other employees, perhaps aside from those who

also used his office, and no evidence of substantial interaction with the public. In other words, even assuming anyone read the speech, there is a factual question as to whether his message would resonate and cause the type of "drum banging"—in the office or otherwise—necessary to potentially disrupt administration operations.

### 2. Motive

Factual questions also exist as to whether Johnson's suspension and/or termination was based on the potential for disruption rather than because of his speech. As noted, Johnson never would have been suspended or terminated had he not written the letter. Defendants, however, contend Johnson was terminated for failing to follow their lawful orders to seek counseling until it was determined that he was psychologically fit to return to duty. Even assuming the lawfulness and propriety of defendants' actions leading up to these orders, a triable issue of fact remains as to defendants' motivation or intent in suspending and terminating Johnson.

Johnson was a union activist who had voiced his political views publicly through political campaigns, the media, and protests against the administration. He was also removed from his position as an officer in the union, allegedly because of his attempt to expose collusion between the union executive board and Ganim, and because of his desire to replace the union president. Both Ganim and Rapice admit to being aware of Johnson and to having observed him in protests in front of the administration building, but they claim not to have been aware of the subject matter of such protests, and that they never personally met him prior to the events prompted by the letter. Johnson, however, alleged in his deposition that, during his tenure as a union officer, Rapice threw him out of the Labor Relations Office and

told him never to come back, and that Rapice or someone acting at his behest or on his behalf asked for a copy of a document Johnson was handing out at a protest. Given this history, and the fact that Johnson had on prior occasions accused Ganim of collusion, it is perhaps understandable that he was distrustful of the process and refused to answer any questions about the letter.

Further, Rapice in his affidavit stated that his supervisor had assigned him the task of investigating the letters, not just in general, but specifically "to see if the letters violated City rules and polices [sic] about appropriate behavior in the workplace." (J.A. 65–66.) There is no evidence that Johnson wrote or sent the letter while at or through work. Taking the facts in the light most favorable to Johnson, an investigation solely to determine if the letters violated workplace rules—and not to, for example, determine the truth of the allegations made—may indicate that the administration felt the letters offered the opportunity to terminate an employee who had been notoriously outspoken against it.

The record provides further evidence of the personal feelings of Rapice, a City Labor Relations Officer, toward Johnson, an outspoken union activist and supporter. For example, in the letter terminating plaintiff's employment with the City, Rapice sarcastically refers to Johnson's "picketing" outside of City Hall, and notes Johnson's refusal to comply with orders, instead choosing, according to Rapice, to make his "customary threats against the Mayor." (J.A. 110.) Considering this, and construing the facts in Johnson's favor, Rapice's investigation of the letters could be found by a trier of fact to be more suspect than it facially appears. Though he was aware, through Dr. Opsahl's report, of incidents of violence in Johnson's past, he was also aware that such incidents had

occurred many years prior, that they were tied to alcohol and drug abuse, that Johnson had been sober and seeing a psychologist for over a decade, and that no incidents had occurred since 1987, with the exception of a traffic altercation. There is no evidence Rapice even made an effort to contact Johnson's psychologist. He only received Johnson's psychologist's report because of Johnson's initiative. Even then, it could be found that Rapice paid little to no attention to the report, suggesting instead that Johnson get another independent medical examination. Curiously, Rapice's letter dated April 22, 1999, which was an update of the status of Johnson's situation, did not even mention Johnson's psychologist's report. The very fact that Johnson had been ordered to obtain an evaluation and a "fit to return to duty" conclusion in the first place is somewhat suspicious, given the constitutionally protected nature of the letter and the circumstances leading up to and surrounding it, all of which Rapice was arguably aware. The above facts, stated in a light most favorable to Johnson, create a triable issue as to whether Johnson was suspended and/or fired in retaliation for writing the letter.

## C. Qualified Immunity

Rapice alleges he is entitled to qualified immunity. The prohibition against suspending or terminating employees for the content of their speech has been clearly established since 1968. *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002). Therefore, Rapice may prevail on his qualified immunity defense only if it was "objectively reasonable for [him] to believe that his conduct did not violate [Johnson's] rights." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir.2003) (internal quotations and citation omitted).

There are factual questions as to what information Rapice possessed at the time he acted. Among the allegations lodged by Johnson are that: Johnson and the administration, including specifically Rapice, had a long-standing, contentious relationship; Rapice had permanently ejected Johnson from the Labor Relations Office; Rapice or someone else from the Labor Relations Office approached Johnson during a protest and asked for a flyer addressing the topic of the protest, and therefore that Rapice, contrary to his affidavit, knew of the subject matter of the protests; Johnson had never acted with violence in the workplace despite sending several critical letters to the administration; and Johnson had no work history suggesting a propensity towards violence. If we assume these facts as true, or construe them in Johnson's favor, it cannot be said as a matter of law that Rapice's conduct was objectively reasonable in light of Johnson's clearly established rights. In other words, the existence of these factual disputes precludes a meaningful resolution of the qualified immunity defense at the summary judgment stage.

▆▆ Moreover, it should be noted that the above factual disputes give rise to the ultimate question in this retaliation case, to wit, whether Rapice acted with retaliatory motive in taking action against plaintiff. Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts such as the one alleged by Johnson. Otherwise, defendants in such cases would always be immunized from liability " 'so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds.' " *Locurto v. Safir,* 264 F.3d 154, 169 (2d Cir.2001) (quoting *Hoard v. Sizemore,* 198 F.3d 205, 218 (6th Cir.1999)). Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail. *Id.* at 170. As noted, Johnson has alleged sufficient, particularized facts that, if true, could be found to circumstantially give rise to a finding of retaliatory intent/motive.

Accordingly, that part of the judgment granting summary judgment to Rapice is vacated and remanded for proceedings consistent with this opinion.

### D. Ganim and the City

The Magistrate Judge concluded summary judgment was appropriate as to Ganim because Johnson offered no evidence of Ganim's personal involvement in the decisions to suspend and terminate him. We have reviewed the record and find no reason to disturb this conclusion. Accordingly, that part of the judgment granting summary judgment to Ganim is affirmed.

With respect to the City, the Magistrate Judge concluded summary judgment was appropriate because Johnson "has not alleged or proved any of the predicates required by *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)." (J.A. 217.) Johnson, by failing to raise this issue on appeal and failing to respond to defendants' arguments, has waived his right to appeal this decision. *See Davis v. New York,* 316 F.3d 93, 102 n. 5 (2d Cir.2002) (citing *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995)). Accordingly, that part of the judgment granting summary judgment to the City is affirmed.

### CONCLUSION

For the foregoing reasons, we affirm that part of the district court's order granting summary judgment in favor of Ganim and the City, and vacate and re-

mand that part granting the same in favor of Rapice.