**Kathleen RUTHERFORD, Plaintiff,**

**v.**

**KATONAH–LEWISBORO SCHOOL DISTRICT, Dr. Robert Roelle, Superintendent of Schools, and Dr. Karen Benedict, Deputy Superintendent of Schools, Defendants.**

**No. 08 Civ. 10486(CM).**

United States District Court, S.D. New York.

Nov. 3, 2009.

Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiff.

Lewis R. Silverman, Rutherford & Christie, LLP, New York, NY, for Defendants.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

McMAHON, District Judge:

In the suburbs, where education is the only priority, there is hyper-sensitivity on the part of all concerned whenever anything remotely out of the ordinary happens at local schools. Community and staff concern is magnified if the unusual activity involves student/teacher interaction. The lawsuit before the Court grows out of just such an incident.

## INTRODUCTION

Plaintiff Kathleen Rutherford, a public school teacher, brings this action pursuant to 42 U.S.C. § 1983 alleging that the Katonah–Lewisboro School District (the "District"), Superintendent of Schools Dr. Robert Roelle ("Roelle") and Deputy Superintendent of Schools Dr. Karen Benedict ("Benedict") (collectively, "Defendants") violated her constitutional rights in the course of suspending, investigating and transferring her during the summer of 2008. Plaintiff asserts that Defendants (1) violated her Fourteenth Amendment right to substantive due process; (2) infringed upon her First Amendment right to free association by directing her not to communicate with fellow District employees—including her union representative—while she was suspended; and (3) violated her Fourteenth Amendment right to privacy by disclosing certain personal information.

Defendants, having answered, move under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. For the reasons stated below, the Court grants the motion and dismisses all claims against individual defendants Roelle and Benedict. The Court also dismisses Plaintiff's Fourteenth Amendment claims against the defendant school District. The District's motion is denied with respect to Plaintiff's First Amendment free association claim.

## FACTUAL BACKGROUND

Kathleen Rutherford has served as a school teacher in the Katonah–Lewisboro School District for more than two decades.[1] From 1996 until 2008, Plaintiff taught fifth-grade science at the Increase Miller Elementary School. Each year, Plaintiff coordinated and supervised a science fair (the "Science Fair"), in which her students participated.

On June 10, 2008, Deputy Superintendent of Schools Benedict asked Plaintiff to recount what she had done on June 6, 2008, which was the day of the Science Fair. Benedict asked Plaintiff whether she had destroyed student work or raised her voice. Plaintiff denied destroying any student work, and said that if she had raised her voice, it was to make herself heard over the din created by sixty children, not to express anger.

That same day, Benedict advised Plaintiff that she was being placed on administrative leave, with full pay and benefits, pending the District's investigation into her conduct on June 6. Plaintiff was directed "to have no further communication with any District employee," including "any verbal, written or electronic communication whatsoever," during the period of her suspension (the "Directive"). A copy of the June 10, 2008 letter from Benedict to Plaintiff containing this Directive is attached as Exhibit C to the moving declaration of Lewis R. Silverman, dated March 13, 2009 (the "Silverman Declaration").[2]

---

1. Unless otherwise noted, the facts for this Rule 12(c) motion are taken from the allegations in Plaintiffs complaint.

2. In deciding a Rule 12(c) motion for judgment on the pleadings, a court follows the rules applicable to Rule 12(b)(6) motions, and so may consider documents referenced in the complaint and documents that are in the

Plaintiff alleges that she complied with the June 10 Directive, which she calls a "gag order" (Pl.'s Resp. to Defs.' Mot. to Dismiss, Mar. 23, 2009 ("Pl.'s Br."), at 7), for "several months after its issuance" (Compl. ¶ 21). Plaintiff contends that she was thereby deprived of the right to freely associate with friends, colleagues and her union representative. Plaintiff alleges that no legitimate government interest triggered the Directive, and that it infringed on her First Amendment associational rights.

On June 16, 2008, six days after the Directive was issued, Benedict advised Plaintiff that the Katonah–Lewisboro Board of Education (the "Board") was directing Plaintiff to see a psychiatrist. The Board (and only the Board) has this power under section 913 of New York's Education Law, which authorizes boards of education "to require any person employed by the board of education … to submit to a medical examination by a physician … in order to determine the physical or mental capacity of such person to perform his or her duties." N.Y. Educ. Law § 913 (Consol. 2009).

Plaintiff further alleges that "defendants listed on a publicly accessible web site the fact that they had directed plaintiff to see a psychiatrist, thereby publicly embarrassing her and depriving her of privacy with regard to this highly personal matter." (Compl. ¶ 15.) The listing in question refers to the District's posting on its website of a resolution passed at the Board's meeting of June 12, 2008. This "Resolution Regarding Education Law § 913" (the "Resolution") is "Item 5.11" in the minutes of the June 12 meeting of the Board, and can be found at Exhibit F to the Silverman Declaration. The Resolution appeared on the District's website as part of the posting of the minutes of the June 12 Board meeting. The allegedly constitutionally offensive Resolution states, in pertinent part:

> NOW, THEREFORE, pursuant to Education Law § 913, IT IS HEREBY RESOLVED, that Employee No. 785 is directed to report for a medical examination, which examination will include various medical assessments in order to determine the mental/physical capacity of such person to perform his/her duties as an employee of the Katonah–Lewisboro Union Free School District, the said medical examination to be before Allen Reichman, M.D., at his office located at 190 Willis Avenue, Room 114, Mineola, New York, 11501.

(Silverman Decl. Ex. F at 6.)[3] The Court notes that the Resolution refers to Plaintiff not by name, but only as "Employee No. 785," and does not specify the gender of Employee No. 785. The Resolution does not specify that the doctor Employee No. 785 was ordered to see is a psychiatrist.

In August 2008, Plaintiff's suspension ended; however, she was not allowed to resume her position at Increase Mather School, but was involuntarily transferred to a different school in the District. Plain-

plaintiff's possession or that the plaintiff knew of and relied on in bringing suit. *See U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras,* No. 98 Civ. 3099(JGK), 2001 WL 300735, at *2 (S.D.N.Y. Mar. 27, 2001); *see also Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991). The Court has, therefore, considered the actual text of various documents, such as Benedict's June 10 letter, that Plain-

tiff clearly referred to and relied on in bringing this action.

**3.** Item 5.11 goes on to direct "Employee No. 785 … to produce at said medical examination any and all medical records related to the present state of his/her health for the past three (3) years," but that portion of Item 5.11 is not mentioned in Plaintiff's complaint, and is not at issue in this litigation.

tiff characterizes the involuntary transfer as a punishment and asserts that it violated state law, because the District did not invoke and follow the procedures set forth in section 75 of the New York Civil Service Law (Compl. ¶ 16). That provision controls the discipline of public employees; it also grants non-tenured teachers certain due process rights. *see* N.Y. Civ. Serv. Law § 75 (Consol. 2009). Plaintiff contends that the transfer signaled to the broader community that she had transgressed, when in fact she had not.

On September 5, 2008, Benedict gave Plaintiff a "counseling memorandum," which Plaintiff asserts "lacked any basis in fact" and was an "outrageous distortion of events." (Compl. ¶¶ 19–20.) The memorandum, which is attached as Exhibit B to the Silverman Declaration, purports to summarize Plaintiff's version of the events of June 6, 2008 (as recounted by Plaintiff in the June 10 meeting), describes the students' (multiple) versions of what happened, reaches conclusions about the propriety of Plaintiff's behavior, and counsels her in that regard. A copy of the memorandum was placed in Plaintiff's personnel file.

The complaint concludes with the allegation that Defendants' actions conveyed to the community that Plaintiff had either engaged in misconduct or was suffering from some sort of mental infirmity—neither of which, she asserts, was true—and that those actions "appear[ ] to be malicious and intended to appease a member of the Board of Education whose children baselessly complained about the plaintiff in early June 2008." As a result, Plaintiff claims, Defendants' conduct is "conscience shocking." (Compl. ¶¶ 27–28.)

Plaintiff asserts that Defendants' conduct constitutes a deprivation of substantive due process in violation of the Fourteenth Amendment; that the June 10 Directive violated her First Amendment

right to free association; and that Defendants' posting of the Resolution violated her Fourteenth Amendment right to privacy. Plaintiff seeks compensatory and punitive damages, as well as an order that would require Defendants to purge Plaintiff's personnel file of any adverse documents relating to this matter, retract the September 5 counseling memorandum, transfer Plaintiff back to the Increase Mather School, and issue her a public apology.

Defendants move under Rule 12(c) for judgment on the pleadings.

## DISCUSSION

### I. Standard of Review

The standard of review for this Rule 12(c) motion for judgment on the pleadings is identical to the standard of review for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099(JGK), 2001 WL 300735, at *2 (S.D.N.Y. Mar. 27, 2001). Thus, the Court must liberally construe all claims, accept all *factual* allegations in the complaint as true, and draw all reasonable inferences in favor of Plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir.2003): *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir.2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*citing Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations, citations and alterations omitted). Unless a plaintiff's well-pleaded allegations of fact have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *Iqbal*, 129 S.Ct. at 1950–51.

## II. Substantive Due Process Claims

Plaintiff asserts two separate Fourteenth Amendment substantive due process claims. The first, a generalized substantive due process claim, is based on the entirety of Defendants' conduct, which Plaintiff alleges shocks the conscience. (Compl. ¶¶ 28, 30.)[4] Plaintiff's second claim alleges that the District's posting of the Resolution directing her to see a psychiatrist violated her substantive due process right to privacy. (*Id.* ¶ 32.) Both claims are dismissed as against all Defendants.

### A. Defendants' Actions, Taken Collectively, Do Not Shock the Conscience

■ Executive action does not deprive an individual of substantive due process unless it "shocks the conscience." *County of Sacramento*, 523 U.S. at 846–47, 118 S.Ct. 1708 (*citing Rochin v. California*,

342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir.1999). Thus, to withstand a Rule 12(c) motion, a plaintiff asserting a substantive due process violation must plead facts tending to show that the government action was so outrageously arbitrary as to constitute a gross abuse of power that shocks the conscience.

What can be fairly inferred from the allegations in Plaintiffs complaint?

■ At least two students (who apparently happen to be the children of a member of the Board) complained in early June 2008 about Plaintiff's behavior in connection with the Science Fair. The students' complaints were brought to the attention of District officials, who met with Plaintiff and questioned her about what had occurred on June 6. Plaintiff denied that anything untoward had happened. In response to specific questions, Plaintiff denied that she had destroyed student work, and while she admitted that she might have raised her voice, she denied that she had done so in anger. From the fact that Plaintiff was specifically asked whether she had destroyed student work or raised her voice, one can fairly infer that the complaining students accused Plaintiff of both behaviors.

School officials were thus confronted with conflicting stories, one of which suggested that a teacher had engaged in be-

---

**4.** The June 10 Directive that forms the basis for Plaintiff's First Amendment claim cannot also serve as a basis for Plaintiff's substantive due process claim. *See County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). The Court therefore analyzes what Plaintiff refers to as the District's "gag order" (Pl.'s Br. at 7) in the First Amendment context, *infra* at III, and not

according to the "more generalized notion of substantive due process." *See County of Sacramento*, 523 U.S. at 842, 118 S.Ct. 1708. The Court notes, however, that the Directive could not support Plaintiff's substantive due process claim because, like the rest of Defendants' conduct, it falls well short of shocking the conscience.

havior that is, at the very least, unusual (destroying student work is not something we customarily associate with teachers). One can thus fairly infer that District officials decided they needed to investigate the matter further, and that Plaintiff was suspended and directed not to contact other District employees pending such further investigation.

In addition, the District invoked its authority under New York Education Law § 913 and ordered Plaintiff to report for a medical examination. The Resolution passed by the Board, to which Plaintiff refers but which she does not accurately describe (Compl. ¶ 15), directs "Employee No. 785," whose gender is referred to as "his/her," to report for a "mental/physical" examination (Silverman Decl. Ex. F at 6). The Resolution does not mention Plaintiff's name or use the word "psychiatrist." The Resolution was posted on the District's website along with the rest of the minutes of the Board's June 12, 2008 meeting. Plaintiff does not allege that her situation was publicly discussed at the meeting.[5]

Eventually, Plaintiff was reinstated, but she was involuntarily transferred to another school. District officials did not invoke section 75 of the New York Civil Service Law, which sets forth the standards for disciplining civil service employees, in connection with this involuntary transfer. See N.Y. Civ. Serv. Law § 75 (Consol. 2009). This is not surprising, since the discipline of tenured teachers is governed by a different statute, New York Education Law § 3020–a (Consol. 2009).

As a matter of law, none of what can be reasonably inferred from the allegations in the complaint is outrageously arbitrary or conscience-shocking so as to be actionable as a violation of substantive due process.

In opposition to Defendants' motion, Plaintiff argues, "Taking the facts as plead in the Complaint, the school district and the individual defendants had no possible basis for ordering plaintiff to undergo a psychiatric evaluation, suspend her at the tail end of a school year, involuntarily reassign her from a school at which she served as a superb, highly respected teacher for eleven years and publicly malign her character by these very public actions." (Pl.'s Br. at 6.) Thus, Plaintiff's generalized substantive due process claim is firmly grounded in her contention that her version of what happened at the Science Fair, not the version given by the complaining children, is true.

The fundamental flaw in Plaintiff's claim is patent: she pleads no facts from which one could reasonably infer that the District officials acted *for no reason at all.* The allegations in Plaintiff's complaint make clear that District officials knew Plaintiff had been accused of destroying student work and raising her voice to her students. Such behavior by an elementary school teacher might well be considered inappropriate. They also knew that Plaintiff denied the allegations. But Plaintiff alleges not a *single fact* suggesting that Defendants had concluded, at the time they suspended Plaintiff and ordered her to submit to a medical examination, that the complaining students were making unwarranted accusations about Plaintiff. Unlike a court confronted with a motion directed to the pleadings, when Defendants acted they were not required to credit Plaintiff's denial of wrongdoing.

---

5. Defendants assert that, as with all personnel resolutions, Plaintiffs situation was discussed only in executive session. (Defs.' Mem. at 3.) The Court cannot consider this assertion on a motion for judgment on the pleadings. However, nothing in the minutes that were posted on the website indicates that the Board went into executive session prior to passing the Resolution. The minutes show that the Board went into executive session, but only after Plaintiff's matter had been disposed of. (*See* Silverman Decl. Ex. F.)

Plaintiff, a teacher with years of experience in the District, no doubt expected that her denial of any improper behavior would be believed, and the matter immediately closed. But the complaint reveals that school officials were confronted with two different versions of what actually happened on June 6. Plaintiff cannot create a substantive due process claim out of whole cloth simply by asserting that Defendants should have believed her rather than the children. Nor can she bootstrap inferences about what District officials actually believed in June of 2008 onto the Court's obligation to presume the truth of her well-pled factual allegations—one of which is that she did nothing wrong.

Similarly, Plaintiff alleges not a single *fact* tending to show that District officials took action against her only because the complaining children's parent was a member of the Board. The complaint states only that "Defendants' conduct *appears* to be malicious and intended to appease a member of the Board of Education whose children baselessly complained about the plaintiff in early June 2008." (Compl. ¶ 27) (emphasis added). That is not an allegation of fact. It is a conclusion that Plaintiff has drawn from her insistence that the children's complaints about her behavior were "baseless[ ]"—a self-interested contention that may or may not be true, and that District officials had no obligation to accept as true. One cannot reasonably infer that the children were lying simply and solely from the fact that their parent was on the Board.

In sum, Defendants, having received complaints from students about Plaintiff's behavior toward them, were fully within their rights to look into the matter, regardless of the identity of the complaining students' parent. And when Defendants were confronted with two different versions about what had occurred, they were not constitutionally required to credit Plaintiff and disbelieve the students, no matter how excellent Plaintiff's reputation or how lengthy her tenure. Defendants had the right (possibly even a duty, given the nature of the complaints) to investigate allegations of inappropriate classroom behavior by a teacher. Conducting the investigation thus cannot be deemed conscience-shocking.

Nor does it shock the conscience that Plaintiff was suspended—with full pay and benefits—while the investigation continued; neither, given the nature of the allegations against her, does the District's invocation of its statutory authority to require Plaintiff to undergo a fitness evaluation. Plaintiff obviously found these actions hurtful, but they can in no sense be described as arbitrary or a gross abuse of power.

The District's decision to transfer Plaintiff to a different school also does not shock the conscience. By law, and often by contract as well, superintendents of schools have the power to transfer teachers from one school to another within their districts. *See* N.Y. Educ. Law §§ 1711(2)(e), 2508(5), 2566(6) (Consol. 2009) (providing that superintendents in all New York State school districts have the power "to transfer teachers from one school to another," subject to confirmation by the local board of education); *id.* §§ 1711(4), 2508(7), 2566(9) (allowing the provisions that govern the transfer of teachers to be modified by collective bargaining agreements); *see also Adlerstein v. Bd. of Educ.*, 64 N.Y.2d 90, 485 N.Y.S.2d 1, 474 N.E.2d 209, 214 (1984) (holding that superintendent's power to transfer teachers is "absolute in the absence of contractual provision otherwise or of malice, bad faith, gross error or prejudice").[6] Given

---

6. Defendants assert in their reply brief that

the District's collective bargaining agreement

the broad discretion with which superintendents are permitted to transfer teachers to a different school in the same district, and in the absence of a single factual allegation that would suggest the District's decision to transfer Plaintiff was malicious, or even arbitrary, the Court has little trouble concluding that the transfer falls well short of conscience-shocking conduct as a matter of law.

Plaintiff's suggestion that the involuntary transfer was disciplinary in nature (Compl. ¶ 16) is utterly lacking in merit. Under the New York Education Law, a tenured teacher can be disciplined only by reprimand, fine, suspension for a fixed period without pay, or dismissal. N.Y. Educ. Law § 3020–a(4). Transfer to another school within the District is not a disciplinary penalty within the meaning of the statute that governs the discipline of tenured teachers. If Plaintiff has invoked Civil Service Law § 75 in an effort to get around this unhelpful fact, her effort is unavailing, since that statute does not apply to Plaintiff, who enjoyed the benefits of tenure.

In short, accepting all *factual* allegations in the complaint as true and drawing all *reasonable* inferences in Plaintiff's favor, Defendants' conduct falls well short of the "outrageously arbitrary" and "conscience-shocking" standard that must be met to plead a substantive due process claim. Defendants' motion for judgment on the pleadings is granted as to the first substantive due process claim.

with Plaintiff's union expressly permits the involuntary transfer of a teacher from one school to another. (Defs.' Reply Mem. in Further Supp. of Defs.' Mot. to Dismiss, Apr. 15, 2009 ("Defs.' Reply"), at 1.) Obviously, the Court cannot consider this on a Rule 12(c) motion, since the union contract is not alluded to in the complaint and so is not part of the record on this motion. If, however, it is true that the union contract authorizes such transfers, then Plaintiff's argument about the transfer's being punitive is not just meritless, but frivolous.

## B. Defendants Did Not Violate Plaintiff's Right to Privacy

■ Plaintiff's second substantive due process claim asserts that Defendants violated her Fourteenth Amendment right to privacy when they posted the Resolution directing Plaintiff—identified only as "Employee No. 785"—to undergo a "mental/physical" examination by a doctor whose area of specialization was not mentioned, but whose name was given and who was, in fact, a psychiatrist. (Compl. ¶ 32; Silverman Decl. Ex. F at 6.)

■ The Supreme Court has long recognized a right to privacy protected by the Due Process Clause of the Fourteenth Amendment. *See Whalen v. Roe*, 429 U.S. 589, 598–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The substantive due process right to privacy involves at least two different kinds of interests. One is the interest in autonomy when making certain types of important decisions, such as those concerning marriage, procreation, and child rearing. *See id.* at 599–600 & n. 26, 97 S.Ct. 869. The other is the "interest in avoiding disclosure of personal matters," *id.* at 599, 97 S.Ct. 869, often characterized as the "right to confidentiality," *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir.2005). This case involves Plaintiff's assertion of a right to confidentiality in the information disclosed in the Resolution.

■ To establish a violation of the constitutional right to privacy, a plaintiff must first show that she had a privacy interest—that is, a "reasonable expectation of privacy"—in the information that was disclosed. *See Nixon v. Adm'r of Gen.*

*Servs.,* 433 U.S. 425, 457, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Sean R. v. Bd. of Educ.,* 794 F.Supp. 467, 469 (D.Conn.1992). When a constitutionally protected privacy right is burdened by legislation, a court in this Circuit applies "intermediate" scrutiny and upholds the statute only if a substantial government interest outweighs the burdened privacy right. *O'Connor,* 426 F.3d at 202–03. "The Supreme Court has, however, set the bar higher for challenges to *executive* action." *Id.* at 203 (emphasis added). When a plaintiff alleges that executive action infringed upon a protected privacy right, the "plaintiff must show not just that the action was literally arbitrary, but that it ... 'shocks the conscience.'" *Id.* (*quoting County of Sacramento,* 523 U.S. at 846, 118 S.Ct. 1708).

*O'Connor,* like this case, involved a public school teacher's challenge to action taken by a board of education that allegedly infringed upon the teacher's Fourteenth Amendment right to privacy. In *O'Connor,* the Wethersfield Board of Education received complaints about plaintiff O'Connor's behavior, and placed O'Connor on paid administrative leave pending an investigation. 426 F.3d at 191. At the conclusion of the investigation, the Wethersfield Superintendent of Schools issued a report concluding that O'Connor had behaved inappropriately. *Id.* at 192. The Board invited O'Connor back to work, but conditioned reinstatement on his submitting to a psychiatric evaluation and signing a broad release for his past medical records, including records relating to O'Connor's treatment at an alcoholism facility some thirteen years earlier. *Id.* at 191–94. O'Connor was told that he would be disciplined if he failed to meet the conditions. *Id.* at 193. He sued, alleging that the Board's imposition of conditions violated, *inter alia,* his substantive due process right to privacy in his medical records, especially the old records just described. *Id.* at 187.

The Second Circuit held that the Wethersfield Board could be found to have violated O'Connor's right to privacy only if its actions were "arbitrary in the constitutional sense," which is to say, if they shocked the conscience. *Id.* at 203 (*quoting Collins v. City of Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Mere irrationality was insufficient. *O'Connor,* 426 F.3d at 203. Chief Judge Walker noted that the Wethersfield Board's mere negligence, "incompetence or confusion" could not give rise to a violation of O'Connor's right to privacy. *Id.* at 203–04. And, because a school board does not owe a special duty of care to its teachers, even "deliberate indifference by the Board would not support liability." *Id.* at 203. "But if the Board acted out of spite," or if it "intended to oppress O'Connor" by insisting on the "needlessly broad" release of medical information, "that intent would plainly support liability." *Id.* at 203–04.

The Second Circuit gleaned from the Supreme Court's decision in *County of Sacramento* "this important principle: whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken." *Id.* at 203. Because the testimony of the Wethersfield Board official who demanded access to the medical records directly contradicted the Board's stated rationale for wanting to examine them, the Second Circuit reversed the award of summary judgment against the school district and remanded for trial, stating, "The summary judgment record is insufficient to allow us to determine what motivated the Board's insistence that O'Connor release his medical records to it." *Id.* at 203–04.

This Court will assume, without deciding, that Plaintiff had a privacy interest in the fact that she was directed to submit to a medical fitness examination. The fact

that the Resolution identified her only by employee number and masked her gender suggests that Defendants understood Plaintiff to have a reasonable expectation of privacy in what was a sensitive, personal matter.

I will also assume, for purposes of this motion, that the posting of the Resolution (as it was actually worded) along with the rest of the Board's minutes constituted "disclosure" of information protected by Plaintiff's right to privacy, although it is by no means clear to the Court that the Resolution as posted disclosed protected information in a way that sufficiently identified Plaintiff.

Nonetheless, I conclude that the facts pleaded do not give rise to any reasonable inference that Defendants' posting of the Resolution could constitute conscience-shocking executive action.[7]

Plaintiff contends that the Board's posting of the Resolution was "baseless." (Pl.'s Br. at 9–10.) Defendants respond that including the Resolution on the District's website "obviously furthered the important governmental objective of advising the community about Board actions." (Defs.' Mem. in Supp. of Mot. to Dismiss, Mar. 13, 2009 ("Defs.' Mem."), at 8.) The Court certainly can appreciate the desire of public officials to advise their constituents about their activities; indeed, "sunshine laws" applicable to boards of education in New York require that action be taken in public, and it comes as no surprise that board minutes are made available to residents of the school district and other interested persons. But "sunshine" does not automatically translate into the community's right to know that a particular employee (even if identified only by number) was ordered to report for a fitness examination. I draw from Plaintiff's

complaint (read most favorably to her) that the Board's decision to post the Resolution may not have been grounded in any legal obligation to do so and was both thoughtless and ill-advised. It certainly upset and embarrassed a long-term (and apparently valued) District employee.

But even if the Board's decision was careless, or baseless, or even irrational, that is not enough to make out a violation of Plaintiff's constitutional right to privacy. *See O'Connor,* 426 F.3d at 202–03. The question is whether any factual allegation in the complaint could plausibly be read as raising an inference of a malicious motive on the part of the Board when it posted the Resolution as part of the minutes of the June 12 meeting.

The answer, I fear, is no.

The allegations of the complaint, fairly read (and that includes reading the Resolution as it is written, not as it is paraphrased in the complaint), admit of a plausible inference that Defendants were *not* deliberately indifferent to Plaintiff's privacy. The very fact that the Board took a number of precautions in the published text of the Resolution—not identifying Plaintiff by name, or by gender, or by school assignment, or by anything else that could be tied to her using publicly available information—as well as sending her to a physician located far from northeastern Westchester (the doctor is located on Long Island), suggest that the District was trying to protect Plaintiff's privacy. That its efforts may have been clumsy, or even ineffective (at least with respect to parents who were in the inevitable gossip chain that characterizes suburban communities when the subject is goings-on at the schools), does not matter; the text of the Resolution refutes the inference that De-

---

7. There can be no dispute that this case involves executive action, not legislation; as in *O'Connor,* Plaintiff challenges actions taken by a school board, and not a statute, ordinance, or any other form of legislation.

fendants intended to "injure," "spite," or "oppress" Plaintiff when they failed to excise the Resolution from the minutes as posted on the website.

Plaintiff asserts that Defendants' conduct was "malicious" (Compl. ¶ 27). But that buzzword is, after *Twombly* and *Iqbal*, insufficient; it must be backed up with allegations of fact from which malice can be fairly inferred. Unfortunately for Plaintiff, her pleading contains not a single allegation of *fact* that would support her conclusory allegation of malice. Plaintiff alleges that it "appears" (to her) that Defendants chose to disbelieve her, with all that followed therefrom, in order to placate the parent of the complaining children, who happened to be on the Board. (*Id.*) But that allegation is pure supposition on Plaintiff's part. She does not allege that the Board has a history of sacrificing teachers on the altar of appeasing Board members' private concerns, nor does Plaintiff contend that anyone said or did anything concrete (other than not take Plaintiff at her word and abandon the investigation) that would lend credence to Plaintiff's belief that the Board acted out of deference to one of its own, rather than out of concern for the well-being of the children in the school. Plaintiff does not allege that there was a history of bad blood between her and the Board member whose children's complaint led to the investigation. For that matter, Plaintiff does not affirmatively allege that Defendants actually believed her denials but went ahead with their investigation anyway. And of particular relevance to her due process privacy claim, Plaintiff does not allege a single fact tending to show that the Board included the text of the Resolution in the on-line minutes out of a misplaced desire to placate the parent Board member.

It is simply not possible to infer malice from nothing more than the fact that the complaining children were the children of a board of education member. To put the matter in the language of *Twombly* and *Iqbal*, while it is *conceivable* that Defendants could have acted from the base motive of wanting to appease the complaining children's parent, no fact alleged in the complaint makes it *plausible* to think that Defendants did so. The only "something more" in the pleading before me is Plaintiff's insistence that she did nothing wrong—a contention that the Court must accept as true, but that Defendants had no obligation to accept as true back in June of 2008. For the reasons discussed above, Plaintiff's protestations that she did not engage in any inappropriate conduct do not get her across the line from conceivable to plausible on the issue of culpable state of mind.

It is no answer to note that, in *O'Connor*, the Second Circuit denied summary judgment and sent the plaintiff teacher's substantive due process privacy claim to trial. Plaintiff may argue that she, like the plaintiff in *O'Connor*, is entitled to take discovery so that she can explore the state of mind of the various Defendants before having her claim dismissed. But the standard by which the adequacy of a pleading is judged has altered in the decade since January of 2000, when O'Connor filed his original complaint against the Wethersfield Board of Education. The old *Conley v. Gibson* rule, which long governed a complaint's adequacy, has been "retire[d]," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); a plaintiff can no longer subject a defendant to the burdens of discovery by inserting the word "malicious" into a pleading without providing any factual underpinning for such an allegation. Rutherford is required to allege actual facts that give rise to a plausible inference of malice before the Court may permit a claim like hers to proceed to discovery. In this regard, her complaint is deficient.

## III. Plaintiff's First Amendment Right to Free Association

■ Plaintiff alleges that the Directive ordering her not to communicate with any other District employee during the period of her suspension (which ended up being about ten weeks) violated her First Amendment right to free association. (Compl. ¶¶ 21–24, 31.) In particular, Plaintiff claims that the Directive, which was conveyed to Plaintiff in the June 10, 2008 letter from Deputy Superintendent Benedict, violated her associational rights because it precluded her from conferring with her union representative, who was a District employee. (Pl.'s Br. at 7–9.) In her complaint, Plaintiff also mentions her right to associate with her fellow employees (Compl. ¶ 22), but as there is no constitutional right to "social association," *see City of Dallas v. Stanglin*, 490 U.S. 19, 26, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), her only viable associational claim arises from the limitation the "gag order" placed on her ability to consult with her union representative.[8]

Plaintiff suggests that, because her First Amendment claim does not allege *retaliation*, the associational activity at issue—consulting with her union representative—need not touch upon a "matter of public concern." (*See* Pl.'s Br. at 7–9.) Although no controlling court has explicitly addressed this precise question, I conclude, based on the clear direction that can be found in the First Amendment jurisprudence of the Supreme Court and this Circuit, that the public concern requirement does apply to Plaintiffs non-retaliation associational claim. Because conferring with her union representative about the status of her employment implicates only Plaintiff's own self-interest, not a matter of public concern, her First Amendment claim would thus appear doomed.

However, Plaintiff also argues that the Court should follow the Tenth Circuit and carve out a certain subset of union-related First Amendment cases—of which hers is one—as exempt from the public concern requirement. The parties have not thoroughly briefed this constitutional question, and neither the Supreme Court nor Second Circuit has addressed it; I am, therefore, constrained to postpone its resolution to another day. But, even if the Tenth Circuit is correct, and the associational right here at issue need not touch on a matter of public concern, individual defendants Roelle and Benedict are entitled to qualified immunity, because the law establishing that right is far from well-settled in this Circuit.

### A. The "Public Concern" Requirement Applies to Plaintiffs Claim

It has long been the law that a public employee who claims that she was retaliated against by her employer for exercising her right to free speech must establish that her speech touched on a "matter of public concern" before her claim would be actionable under § 1983. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (*citing Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).[9] The Supreme

---

8. Defendants urge in their reply brief that they did not intend to prevent Plaintiff from contacting her union representative. (Defs.' Reply at 3.) If they did not so intend, then the Directive was overbroad, for it did not carve out the union representative from other District employees, and it is fair to infer that Plaintiff's union representative was a District employee (*see* Pl.'s Br. at 7). Defendants also claim that Plaintiff could have contacted counsel for her union, who is not a District employee. (Defs.' Reply at 3.) Obviously, these assertions of fact go well beyond the text of the pleadings and the documents referenced therein, and so cannot be considered on this motion.

9. Under the *Pickering* balancing test, courts determine the extent to which the government

Court has never definitively decided whether the same rule applies to the exercise of First Amendment associational rights by a public employee. However, in 2004, the Second Circuit held that a public employee asserting a free association retaliation claim must "show that [his] associational activity touches on matters of public concern." *Cobb v. Pozzi*, 363 F.3d 89, 101–03 (2d Cir.2004). A number of other circuits, though not all of them, have reached the same conclusion. *See Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir.1999) (applying public concern requirement to association claims); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249–50 (4th Cir.1999) (same); *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir.1985) (same); *see also Hudson v. Craven*, 403 F.3d 691, 695–98 (9th Cir.2005) (applying public concern requirement to "hybrid" speech/association claim). *But see Breaux v. City of Garland*, 205 F.3d 150, 157 n. 12 (5th Cir.2000) (declining to apply public concern requirement to association claims); *Hatcher v. Bd. of Pub. Educ. & Orphanage*, 809 F.2d 1546, 1558 (11th Cir.1987) (same).

 Here, however, Plaintiff does not allege that she was suspended, investigated and transferred *because* she exercised some First Amendment right; that is to say, she does not advance a retaliation claim. (Pl.'s Br. at 8; *see* Defs.' Reply at 3 ("We do not construe the plaintiff's claim as being a First Amendment retaliation claim ....").) Instead, Plaintiff asserts that Defendants *prevented* her from exercising her First Amendment right to associate with her union representative during the ten weeks while she was being investigated-a period when a unionized employee presumably would have substantial interest in consulting with someone from the union.[10] Plaintiff's argument seems to be that the public concern requirement, born in the context of free speech retaliation claims, should not apply when the First Amendment claim is predicated on action more in the nature of a prior restraint. (*See* Pl.'s Br. at 7–8.)

If this is Plaintiff's argument, it does not stand up in the face of the First Amendment cases of the Supreme Court and this Circuit. It is well-established that a public employee who brings a First Amendment claim alleging a prior restraint on her freedom of *speech* must show that the speech touches on a matter of public concern. *See United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465–66, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU* "). In *NTEU*, the Court addressed the question of whether a statute prohibiting federal employees from accepting compensation for making speeches or writing articles on any subject was an unconstitutional prior restraint on their freedom of speech. *Id.* at 457, 115 S.Ct. 1003. The Court first concluded that the plaintiffs had met the threshold requirement of showing that the "expressive activities in this case fall within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace." *Id.* at 466, 115 S.Ct. 1003. Then, and only then, did the Court engage in the *Pickering* balancing of interests (and find that

---

may permissibly regulate the expression of its employees by balancing "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 578, 88 S.Ct. 1731.

**10.** The "gag order" was lifted at or about the time Plaintiff was transferred, so she was not prevented from talking to her union representative about that personnel action. (*See* Silverman Decl. Ex. C; Pl.'s Br. at 7; Compl. ¶ 16.)

the government could not justify the statute). *Id.* at 466–67, 115 S.Ct. 1003.

Numerous Second Circuit cases have applied the rule that a public employee who brings a First Amendment claim alleging a prior restraint on free speech must show that the speech touches on a matter of public concern. *See, e.g., Wetzel v. Town of Orangetown,* 308 Fed.Appx. 474, 476–77 (2d Cir.2009) (affirming dismissal of police officer's First Amendment claim alleging she was prohibited from speaking with Town officials about disciplinary proceedings against her because "those proceedings are a matter of personal interest, not a matter of public concern"); *Harman v. City of N.Y.,* 140 F.3d 111, 117–19 (2d Cir.1998) (finding that agency employees challenging a rule that restricted their speech to the press about agency practices had stated a viable prior restraint claim because the challenged press policy prohibited employee speech that touched upon matters of public concern).

The Supreme Court has made clear that courts should eschew creating a hierarchy among First Amendment rights. *See McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). In *McDonald,* the Court was presented with a libel claim against a citizen based on letters he had sent to the President criticizing a prospective U.S. Attorney. *Id.* at 480–81, 105 S.Ct. 2787. The defendant argued that the Petition Clause of the First Amendment entitled him to absolute immunity from damages. *Id.* at 481–82, 105 S.Ct. 2787. The Court rejected that argument, reasoning that the right to petition the government is "cut from the same cloth as the other guarantees of that Amendment," and should not be elevated to "special First Amendment status." *Id.* at 482, 485, 105 S.Ct. 2787. The Court concluded that the rights protected by the First Amendment are "inseparable" and that there is no "sound basis" for affording

greater protection to one First Amendment right than to another. *See id.; see also id.* at 489, 105 S.Ct. 2787 (Brennan, J., concurring) ("The Framers envisioned the rights of speech, press, assembly, and petitioning as interrelated components of the public's exercise of its sovereign authority."); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.1993) (relying on the reasoning of *McDonald* in extending the public concern requirement to retaliation claims involving the right to petition); *Belk v. Town of Minocqua,* 858 F.2d 1258, 1262 (7th Cir.1988) (advising against the "stratification" of First Amendment rights, as per *McDonald* ).

Holding that *Connick*'s public concern requirement is inapplicable to non-retaliation associational claims would fly in the face of *McDonald*'s teaching. Such a holding would have the effect of affording greater protection to one First Amendment right—a public employee's right to be free from prior restraints on her associational activity—than to another First Amendment right—a public employee's right to be free from prior restraints on her speech, since only the latter would be constrained by the burden of showing a public concern. In *Cobb,* the Second Circuit relied heavily on *McDonald* in reaching its conclusion that the public concern requirement applies to a free association retaliation claim. *See Cobb,* 363 F.3d at 105–07. Indeed, the *Cobb* court stated that it would be particularly "anomalous" to exempt a free association claim from the public concern requirement—and thereby "accord it an elevated status among First Amendment freedoms"—because the right of association is "derivative" of the text-based First Amendment rights of free speech and peaceful assembly. *Id.* at 105.

Here, as in *Cobb,* to accept Plaintiff's contention that her claim is exempt from *Connick*'s public concern requirement

"would be to elevate the *implicit* First Amendment right of freedom of association over other *explicit* First Amendment rights such as freedom of speech." *Id.* at 106 (internal citation omitted). The *Cobb* court unambiguously stated that it was "unwilling to establish such a rule." *Id.* Given that, as established above, the public concern requirement applies to free speech *prior restraint* cases just as it does to free speech retaliation cases, there is no reason to think that the Second Circuit would reason or conclude any differently if presented with the question of whether the public concern requirement applies to a non-retaliation associational claim. I therefore hold that, in order to state a viable First Amendment free association claim, Plaintiff must allege that the associational activity at issue touches upon a matter of public concern.

The Court draws further support for its holding from the three cases in this Circuit it was able to locate (after a fairly exhaustive search) that address free association "prior restraint" type claims brought by public employees for action taken by their employers. Most recently, in *Dorcely v. Wyandanch Union Free School District,* 665 F.Supp.2d 178 (E.D.N.Y.2009), the plaintiff, a public school teacher, was advised by letter that he had been placed on paid administrative leave; he was prohibited from contacting other staff from his school district, which included his union representative. *Id.* at 185. The court granted summary judgment for the defendant school district and its officials on plaintiff's First Amendment claims. *Id.* at 204–05. First, Judge Hurley held that the restriction on plaintiff's ability to contact other staff members did not violate his right to free speech because "there is no evidence that [plaintiff] wished to speak to his colleagues, his counsel or a union representative on a matter of public concern. Rather, the record indicates that the subject matter he sought to pursue with these individuals pertained to his position with respect to the underlying events that had occurred at the Middle School and to his status in continuing his employment with the District." *Id.* at 204. Judge Hurley then concluded that plaintiff's free association claim failed for the same reason: "there is no information before the Court that [plaintiff] wished to engage in anything other than personal or social association with his colleagues, counsel or a union representative." *Id.* at 204. Thus, the *Dorcely* court did not engage in any *Pickering* interest-balancing because plaintiff's free association claim failed to satisfy the threshold requirement of touching on a matter of public concern. *See id.*; *see also Brady v. Dammer,* 573 F.Supp.2d 712, 724–25, 730 (N.D.N.Y.2008) (dismissing public employee's free association claim alleging defendants had prevented her from meeting with her union representative because "[t]here is no suggestion that these meetings touched on anything other than her personal interests"); *Grennan v. Nassau County,* No. 04–2158(DRH)(WDW), 2007 WL 952067, at *11–13 (E.D.N.Y. Mar. 29, 2007) (granting summary judgment to defendants on school teacher's free association prior restraint claim because she alleged nothing more than interference with "recreational and social association").

Plaintiff does not squarely address *Cobb* (or its reasoning) in her brief, but she distinguishes her case from retaliation cases, thereby implying that *Cobb* is not controlling precedent on the peculiar facts of her case. (*See* Pl.'s Br. at 7–9.) But Plaintiff does not cite a single case, and this Court has not located one, which affirmatively holds that the public concern requirement does *not* apply to free association prior restraint cases. Defendants, for their part, do no better; they rely heavily on *Cobb,* asserting that *Cobb* itself ruled that *any* First Amendment claim brought by a public employee in the Second Circuit

must meet the public concern requirement. (Defs.' Mem. at 6, Reply at 3.) The *Cobb* court, however, was confronted only with First Amendment *retaliation* claims; fairly read, *Cobb* specifically held only that a public employee who asserts a First Amendment free association claim alleging retaliation by her employer must show that the associational activity at issue touches on a matter of public concern. *See Cobb*, 363 F.3d at 101–03. However, as discussed above, the reasoning in *Cobb* and in the Supreme Court precedent on which it relied, taken together with the fact that the public concern requirement clearly applies in free speech prior restraint cases, yields the unavoidable conclusion that the public concern requirement likewise applies to Plaintiff's non-retaliation free association claim.

Having concluded that *Connick*'s public concern requirement applies to Plaintiff's First Amendment claim, the Court turns to the question of whether the allegedly infringed-upon associational conduct implicates a matter of public concern.

## B. The Associational Activity at Issue Does Not Touch on a Matter of Public Concern

 In *Connick*, the Supreme Court defined a "matter of public concern" as one that "relat[es] to any matter of political, social, or other concern to the community." 461 U.S. at 146, 103 S.Ct. 1684. The Supreme Court has since elaborated that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 83–84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004). The public concern requirement is not satisfied "when a public employee speaks ... as an employee upon matters only of personal interest." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684; *see Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir.2003) ("If the speech,

however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern...."). The question of whether a public employee's expressive activity touches on a matter of public concern is an issue of law for the court. *See Johnson*, 342 F.3d at 112.

 Consulting with her union representative about what Plaintiff perceived as Defendants' unwarranted efforts to impugn her reputation as a teacher cannot be said to touch on a matter of public concern. *Cf. Dorcely*, 665 F.Supp.2d at 204. In *Dorcely*, as noted above, the court found that a suspended school teacher's desire to associate with his union representative about "his status in continuing his employment with the District" was a matter of purely private interest. *Id.*; *see also Grennan*, 2007 WL 952067. In *Grennan*, the plaintiff, a public school teacher, claimed she was retaliated against because she had filed a complaint with her union regarding her involuntary transfer and allegedly sub-standard working conditions. 2007 WL 952067, at *3, 8–9. The court found that plaintiff's complaints did not touch on matters of public concern, and thus could not give rise to a First Amendment claim, because plaintiff was "primarily motivated by her own self interest"— she was "not speaking out on matters of public concern but complaining about individual instances that affected her personally." *Id.* at *9.

The "key inquiry" in a case like this is whether the expression in question involved "plaintiff in her role as a disgruntled employee or her role as a concerned citizen." *See Hanig v. Yorktown Cent. Sch. Dist.*, 384 F.Supp.2d 710, 722 (S.D.N.Y.2005) (*citing Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999)). In *Hanig*, a high school guidance counselor claimed that she was retaliated against because she had filed a grievance with her

union alleging that her employer had violated a provision of the New York Education Law. 384 F.Supp.2d at 722–23. The late Judge Conner dismissed plaintiff's First Amendment claim because she had not alleged the requisite casual connection between her speech and the adverse employment action. *Id.* Along the way, Judge Conner stated that he had "serious doubts" as to whether plaintiff's grievance implicated a matter of public concern because "the facts do not suggest that plaintiff was motivated either by a desire to protect the public welfare or a desire to bring the state's alleged wrongdoing to light." *Id.* at 722. Instead, it was "clear that plaintiff's speech related primarily if not exclusively to *her desire to protect her job and/or her reputation as a school counselor,*" and that "[a]ny motivation to advance a public interest was tenuous and incidental." *Id.* (emphasis added). Finally, it is also worth restating the Second Circuit's recent holding in *Wetzel,* 308 Fed. Appx. at 476–77, which, although it did not involve union-related expression, is instructive: there, the court found that the Town's denying one of its police officers the right to contact officials about disciplinary proceedings initiated against the officer did not give rise to a First Amendment claim because those proceedings were matters of personal interest to the officer, not of public concern.

Here, the only reasonable inference that can be drawn from the pleadings is that Plaintiff's desire to communicate with her union representative was motivated by her own self-interest, not by any desire to vindicate federally protected labor relations policies. There is simply nothing in the complaint that suggests Plaintiff wished to confer with her union representative about anything other than "her desire to protect her job and/or her reputation as a school counselor." *Hanig,* 384 F.Supp.2d at 722. That is not "a subject of general interest and of value and concern to the public." *Roe,* 543 U.S. at 83–84, 125 S.Ct. 521. Instead, it is associational activity "focused on matters personal to the employee." *Johnson,* 342 F.3d at 112. There is thus no question in this case that the associational conduct Plaintiff was allegedly barred from engaging in is quintessentially personal, not public, in nature.[11]

Having spent a great deal of time with Plaintiff's counsel, I can anticipate his rejoinder: it is not the context of Plaintiff's consultation with her union representative (which is, in the end, speech) that is critical here, but rather the fact that the "gag order" interfered with her very union membership (which is purely associational). I cannot agree. The "gag order" did not terminate, or even interrupt, Plaintiff's membership in her union. It did temporarily deprive her of one benefit of membership: the right to consult with her union representative. I can conceive of situations where being deprived of that right might implicate issues of public concern—for example, if a teacher were prohibited by the school from talking to her union representative during an organized job action. But on the facts alleged (just barely) in the instant complaint, the only plausible inference that can be drawn is that Plaintiff wanted to talk to her union representative about her job and her rep-

11. It is telling that in her brief Plaintiff argues first that the public concern requirement should not apply to her non-retaliation case, and then that, whether or not it applies, her case belongs to a special subset of cases exempt from that requirement, but *not* that the associational activity in question actually does touch on a matter of public concern. (*See* Pl.'s Br. at 7–9.) Plaintiff's brief cannot be fairly read as conceding this point, but it certainly suggests that she recognizes that her desire to confer with her union representative about her employment situation was a matter of her own self-interest.

utation when they were under attack. As that conversation does not implicate any matter of public concern, I cannot see how any matter of public concern is implicated by Plaintiff's First Amendment associational claim. That does not mean I view the "gag order" as either necessary or wise; but it would elevate association above speech in the world of First Amendment freedoms to imbue the fact of speaking to a union representative about one's personal job status with greater protection than, say, speaking to the local newspaper about one's personal job status.

Furthermore, in *Cobb,* the Second Circuit dodged the question of whether union membership and its correlative benefits, in and of themselves, touched on a matter of public concern. *See* 363 F.3d at 107–08. That the question remains open at that level has implications for the viability of Plaintiff's First Amendment associational claim against the individual defendants, who can benefit from qualified immunity. This will be discussed further below.

## C. Plaintiff's Argument That Her Claim Is Exempt from the Public Concern Requirement Because It Alleges Interference with Her Right to Associate with Her Union

Having concluded that Plaintiff's desire to confer with her union representative does not touch on a matter of public concern, it would appear as if her free association claim is doomed, since the possibility of a First Amendment claim arises only if the public employee meets the threshold public concern requirement. *See Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *Sousa v. Roque,* 578 F.3d 164, 169–70 (2d Cir.2009). However, Plaintiff also argues that, whether or not the public concern requirement applies to non-retaliation free association claims like the one asserted here, a public

employer that has signed a contractual agreement with a union should be estopped from contending that interference with an employee's freedom to associate with that union is constitutionally defensible. (Pl.'s Br. at 8–9.) In other words, Plaintiff suggests that the public concern requirement ought not apply to a certain subset of union-related First Amendment cases, of which hers is one.

Plaintiff relies exclusively on a Tenth Circuit case, *Shrum v. City of Coweta,* 449 F.3d 1132, 1138–39 (2006), in which the Court of Appeals held that the public concern requirement did not apply to a free association claim brought by a unionized public employee who asserted that he was retaliated against because of his union membership. The Tenth Circuit expressly declined to reach the "broader question" of "whether *Pickering* 's public concern requirement applies to freedom of association claims." *Id.* at 1138. Instead, relying on the "*Pickering* test," which balances a public employee's interest in exercising her First Amendment rights against the public employer's need to provide public services in an efficient manner, the Tenth Circuit concluded that a public employer who has signed a union contract is precluded from arguing that its efficient operations would be adversely affected by an employee's association with the union or participation in union activities. *Id.* at 1139 ("Where a public employer has negotiated with an employee union and signed a collective-bargaining agreement, it has contractually agreed to the legitimacy of the union and of its employees' association with the union. The public employer has presumably received the benefit of its bargain, and is estopped from claiming that its 'interests as an employer' are inconsistent with the freedom of its employees to associate with the union . . . ."). The Tenth Circuit's decision was dictated at least in part by a case it had decided more

than a decade earlier, in which the court had already rejected the requirement that a worker demonstrate that his association with the union be a matter of public concern. *See id.* at 1138–39 (*citing Butcher v. City of McAlester,* 956 F.2d 973, 979 (10th Cir.1992)).

Taking the reasoning of *Shrum* (which is, predictably, a retaliation case) one step further, Plaintiff contends that the District cannot logically claim that its interest in efficient operations—an interest it was undeniably permitted to vindicate by investigating student allegations of misconduct by Plaintiff—justified interfering with Plaintiff's right to associate freely with her union representative at a time when she was under investigation. (Pl.'s Br. at 7–9.)

Plaintiff's argument is certainly appealing. Furthermore, it fits neatly into the context of an associational claim based on a prior restraint instead of retaliation. If the Tenth Circuit correctly concluded that a unionized public employer could not plausibly claim to have any interest that would be adversely affected by free association between its employees and the union, it is difficult to see how a public employer could have any interest that would justify prohibiting *future* contact between an employee and the union.

That being said, Plaintiff does not cite, and this Court has not located, a single decision establishing that *Shrum* is settled law in this Circuit. Moreover, the Tenth Circuit's reasoning in *Shrum* suffers from a significant flaw. The *Shrum* court engaged in a *Pickering* balancing of interests to reach what appears to be a logically appealing conclusion: when a public employer has negotiated and contracted with a union, it ceases to have any legitimate efficiency interest that would justify interfering with its employees' association with that union. The problem, however, is that the Supreme Court has made clear that *Connick* 's public concern requirement is a *threshold* requirement that must be met before a court even gets to *Pickering* balancing. *Roe,* 543 U.S. at 84, 125 S.Ct. 521 ("[Plaintiff] fails the threshold [public concern] test and *Pickering* balancing does not come into play."); *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951; *see Harman,* 140 F.3d at 117 ("*Pickering* 's balancing test applies only when the employee speaks as a citizen upon matters of public concern ....") (internal quotation marks omitted).[12] The rationale for this threshold requirement can be traced to one of the core principles of the Supreme Court's jurisprudence in the area of public employee First Amendment claims: "the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." *Connick,* 461 U.S. at 151, 103 S.Ct. 1684. Indeed, the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *NTEU,* 513 U.S. at 465, 115 S.Ct. 1003. *Shrum,* at least on its face, bypassed the public concern requirement altogether and ruled for plain-

---

12. Of course, a court may assume without deciding that the public concern requirement has been satisfied if it is clear that the *government* would prevail in a balancing of interests—that is, in cases where the public concern question is a close one, and the *Pickering* balancing test clearly favors the government (or some other factor mandates that the government win), a court may bypass the public concern element for the sake of efficiency. *See Sousa,* 578 F.3d at 175 n. 8; *see, e.g.,*

*Blackman v. N.Y. City Transit Auth.,* 491 F.3d 95, 99–100 (2d Cir.2007) (assuming plaintiff's speech touched on matter of public concern because balance of interests weighed in favor of Transit Authority); *Cobb,* 363 F.3d at 107 (assuming plaintiffs union membership touched on matter of public concern because plaintiff had failed to establish causal connection between protected expression and adverse employment action).

tiff on the ground that the unionized public employer could not plausibly assert an efficiency-related interest for *Pickering* purposes. The Tenth Circuit's approach seems wholly at odds with the analytical framework established by the Supreme Court. Under *Pickering* itself and its progeny, a public employer need not justify regulation of its employees' expression *unless* the public employee shows that the expression touches on a matter of public concern.

However, it may be more sensible to read the Tenth Circuit's decision in *Shrum* as implicitly holding that the plaintiff's membership in his union—the associational activity that allegedly prompted the adverse employment action—*does* touch on a matter of public concern, thereby triggering the *Pickering* balancing of interests. But this assumption is, at least in this Circuit, also problematic, because it is far from clear that union membership by itself touches on a matter of public concern. *See Cobb,* 363 F.3d at 107 ("We have not had occasion to decide whether union membership alone touches on a matter of public concern . . . ."). More relevant for purposes of Rutherford's claim is the fact that *Connick* and its progeny, including the numerous decisions from this Circuit cited above, indicate that a public employee's *expression* on a quintessentially private matter like her employment status does not rise to the level of a matter of public concern, regardless of whether the person on the other end of the employee's self-interested expression is her union representative. It is hard to see why the association that causes the public employee to engage in said expression should be treated any differently.

Still, it is fair to say that the parties have barely begun to scratch the surface of the issues presented by *Shrum.* The Court has the right to expect significantly better briefing from the parties before addressing so significant a constitutional question; it will be postponed for another day.

And so we turn to the issue that is dispositive for the two individual defendants: qualified immunity.

### D. Qualified Immunity

■ Precisely because the law on the constitutional questions discussed above is unsettled in this Circuit, individual defendants Roelle and Benedict are, at a minimum, entitled to qualified immunity from Plaintiff's claim that the Directive restricted her freedom to associate with her union in violation of her First Amendment rights.

■ Public officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Public officials are thus immune from federal constitutional claims "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Until recently, the qualified immunity inquiry was always a two-step sequence: first, a court had to determine whether, taking the facts in the light most favorable to the party asserting the injury, a constitutional right was violated; second, if the plaintiff had satisfied this first step, the court would decide whether that right was clearly established at the time of defendant's misconduct. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). However, under the Supreme Court's recent decision in *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009), courts are now "permitted to exer-

cise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." A court may therefore proceed directly to the (often more easily answered) question of whether the alleged right was clearly established without deciding whether there was, in fact, a constitutional violation. *Id.* at 818–21 (offering several examples of situations in which it may be sensible for a court to bypass the first step in the *Saucier* sequence). In other words, a district court may immediately reach what is often, in qualified immunity cases, the critical inquiry: whether the law was, in fact, well-settled—because if it was, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727.

At first blush, it might appear self-evident that the law granting a public employee the right to associate freely with her union representative is "well-established." After all, the Bill of Rights bars the government from interfering with any citizen's right of free association.

However, this general proposition does not end the inquiry. Analysis of whether a right is well-established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. This does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. But it does mean that "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. And where no opinion from the Supreme Court or from the Second Circuit specifically addresses either of the constitutional questions—whether the public concern requirement applies outside the context of First Amendment retaliation claims and, even if does, whether a certain subset of union-related First Amendment cases are exempt from that requirement—the law cannot be deemed well-settled for qualified immunity purposes. *Cf. Okin v. Vill. of Cornwall–on–Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir.2009) ("We look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right."); *Velez v. Levy*, 401 F.3d 75, 100–02 (2d Cir. 2005) (rejecting qualified immunity defense because previous Second Circuit decisions clearly established the specific rights in question).

*Shrum*, ironically, proves the point: there, the Tenth Circuit declined to grant qualified immunity to the defendant police chief because it had already ruled, over a decade earlier, that a unionized public employer was estopped for *Pickering* purposes from claiming that its efficiency interests are inconsistent with its employees' freedom to associate with the union. *See* 449 F.3d at 1139. The law on this point was thus well-settled (in the Tenth Circuit), and a police chief in that circuit was charged with knowing that law. *See id.*

Here, the Court has determined that the public concern requirement applies to Plaintiff's claim, and that the only conceivable ground for finding a First Amendment violation lies in Plaintiff's argument that her claim is exempt from the public concern requirement because it alleges interference with union-related association. Plaintiff's argument is based *entirely* on *Shrum*, a decision from the Tenth Circuit. Plaintiff has not cited, and this Court has not located, a single decision from this Circuit suggesting that *Shrum* would be adopted by the Second Circuit. The individual defendants before this Court are

local school officials in Westchester County. They are not bound by the decision in *Shrum* (or *Butcher*), and so would not be charged with knowing that they could be estopped from applying the public concern test because the District had signed a union contract. Roelle and Benedict are thus entitled to qualified immunity from Plaintiffs First Amendment claim.

Even if this Court had determined that the public concern requirement does *not* apply to *any* non-retaliation free association claims, including the one asserted here, the individual defendants would still be entitled to qualified immunity because of the lack of any clear direction from a *controlling* court in the specific context of this constitutional question. Roelle and Benedict are certainly charged with knowing about *Pickering*, *Connick* and their progeny, as well as *Cobb*. Therefore, they were necessarily aware that only speech or associational conduct implicating a matter of public concern could support a First Amendment *retaliation* claim in the Second Circuit. A reasonable school official apprised of that well-developed body of law might well have concluded—for many of the same reasons set forth above—that the public concern requirement applied to *all* First Amendment claims, not just to claims of First Amendment retaliation. Furthermore, a reasonable school official also could (and surely would) have concluded, especially after *Garcetti*, that Plaintiff's association with her union representative during the period of her suspension implicated only a matter of personal interest, not a matter of public concern, particularly since the Second Circuit in *Cobb* declined

to decide whether union membership in and of itself implicates any public concern.

In short, defendants Roelle and Benedict could have reasonably concluded that they were not *constitutionally* prohibited from directing Plaintiff to have no communication with any other District employee—even her union representative—during the roughly ten weeks while they investigated her conduct. That a private employer who issued a similar directive might have committed some unfair labor practice, or that the Directive might constitute a violation of the collective bargaining agreement between the District and its unionized employees,[13] does not mean that the school officials violated the First Amendment. *Cf. Smith v. Ark. State Highway Employees Local 1315*, 441 U.S. 463, 464, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) ("[T]he First Amendment is not a substitute for the national labor relations laws.").[14]

Qualified immunity thus protects individual defendants Roelle and Benedict from suit on Plaintiff's First Amendment claim. It is dismissed as to them. The District's motion for judgment on the pleadings on that claim is denied, but the legal issues identified above can be raised anew when the District makes its inevitable motion for summary judgment.

### *CONCLUSION*

For the reasons set forth above, the Court grants Defendants' motion for judgment on the pleadings on both of Plaintiff's substantive due process claims, including her right to privacy claim. The Court also

---

**13.** The terms of the collective bargaining agreement are not before the Court on this Rule 12(c) motion for judgment on the pleadings.

**14.** Frankly, the Court very much doubts that Defendants ever thought about the fact that

their broad Directive necessarily barred Plaintiff from contacting her union representative. It may well not have been their intention to impose such an impediment. But that is supposition, and unnecessary to the Court's conclusion.

grants judgment to the individual defendants on Plaintiff's First Amendment claim on the ground of qualified immunity. The Court does not grant judgment for the District on Plaintiffs First Amendment claim, which survives as against the District only. The docket clerk is hereby directed to remove Defendants' motion for judgment on the pleadings (Docket No. 6) from the Court's list of pending motions.